UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

FRANCES PARKER                  CIVIL ACTION NO. 09-cv-1859

VERSUS                               JUDGE JAMES

JOHN DUFRESNE, ET AL            MAGISTRATE JUDGE HORNSBY

### REPORT AND RECOMMENDATION

**Introduction**

    Frances Parker ("Plaintiff") filed this civil action against four defendants based on allegations of copyright infringement, breach of contract, and tort theories such as detrimental reliance and unjust enrichment. The defendants have joined in a Motion to Dismiss (Doc. 9) that asserts a lack of personal jurisdiction over the defendants, Eleventh Amendment immunity for three of the defendants, and improper venue. It is recommended, for the reasons that follow, that all claims be dismissed with the exception of one copyright infringement claim against defendant John Dufresne.

**Personal Jurisdiction**

    **A. Principles of Law**

    The Louisiana long arm statute, which this federal diversity court must apply, extends as far as is permitted by due process. <u>Patin v. Thoroughbred Power Boats Inc</u>., 294 F.3d 640 (5th Cir. 2002). The exercise of personal jurisdiction over a defendant comports with due process only if (1) the defendant has purposefully availed himself of the benefits and

protections of Louisiana by establishing "minimum contacts" with Louisiana and (2) the exercise of personal jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice. Allred v. Moore & Peterson, 117 F.3d 278, 285 (5th Cir. 1997).

Minimum contacts with Louisiana may arise incident to the federal court's general or specific jurisdiction over the non-resident. General jurisdiction is invoked where the non-resident maintains continuous and systematic contacts with Louisiana. Specific jurisdiction is appropriate only when the nonresident's contacts with Louisiana arise from, or are directly related to, the cause of action asserted by the plaintiff. Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001).

On a pretrial motion such as this one where no evidentiary hearing is held, the uncontroverted allegations in the plaintiff's complaint must be taken as true, and any conflicts between facts contained in the parties' affidavits must be resolved in the plaintiff's favor. Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990). Those facts must create for the plaintiff a *prima facie* showing of jurisdiction. Travelers Indemnity Co. v. Calvert Fire Ins. Co., 798 F.2d 826, 831 (5th Cir. 1986). If the plaintiff satisfies that minimal standard, he must still prove the jurisdictional facts at trial or through hearing by a *preponderance of the evidence* before he may obtain relief on the merits against the non-resident. Id.; Felch v. Transportes Lar-Mex, 92 F.3d 320, 326 (5th Cir. 1996).

## B. Relevant Facts

The uncontroverted allegations in this complaint, the facts set forth in the affidavits (with conflicts resolved in Plaintiff's favor), and background information taken from reported decisions provide the relevant facts that are fairly summarized herein. The body of Brenda Spicer, a former basketball player at Northeast Louisiana University ("NLU"), was found in a trash dumpster on the school's Monroe, Louisiana campus in March 1987. There was evidence of sperm in the victim's vagina and rectum but no trauma in either area. The coroner determined that Spicer had been strangled to death. Joel Tillis had been a friend and former roommate of Spicer's. Tillis's boyfriend, Irvin Bolden, was charged with the murder of Spicer, but a jury acquitted him.

Bolden and Tillis later moved to Tennessee. Ms. Tillis disappeared, and her body was found a month later in Arkansas. Bolden was suspected of murdering Tillis, but he was not charged at the time. He moved to New Jersey, where he began to live with Jennifer Spurlock. That relationship became rocky, leading to criminal charges and restraining orders. Spurlock told New Jersey police that Bolden told her that he murdered both Spicer and Tillis. Police followed up on this information and eventually obtained a recorded confession from Bolden in which he admitted killing both Tillis and Spicer.

Bolden pleaded guilty in Tennessee to involuntary manslaughter of Tillis, and in 1992, he received an agreed sentence of 10 years. The State of Louisiana then convicted Bolden of perjury in connection with his testimony at the Spicer murder trial, and the court imposed

a 10-year sentence consecutive to any other sentence. See State v. Bolden, 680 So.2d 6 (La. App. 3d Cir. 1996); Bolden v. Warden, 194 F.3d 579 (5th Cir. 1999); and State v. Bolden, 639 So.2d 721 (La. 1994).

Plaintiff, a resident of Monroe, authored and copyrighted a manuscript ("the Work") that she describes as a true crime story about the Monroe murder and Plaintiff's investigation into the case. Plaintiff registered the Work with the Copyright Office in 1993 and has since been the sole owner of the copyright in the Work. Complaint, ¶¶ 8-13.

John Dufresne has been a resident of Florida since 1989, but from 1984 to 1987 he taught writing and literature classes at NLU in Monroe. Dufresne, who is now a professor at Florida International University, has a number of books, short stories, and other writings that have been published. Dufresne Declaration, ¶¶ 2-6.

Plaintiff, who lived in Florida from 1994 to 2001, approached Dufresne in 2000 regarding her then-unpublished manuscript. She asked Dufresne to write a screenplay and find a producer for it. Dufresne and Plaintiff entered into an agreement, while they both lived in Florida, regarding Dufresne's role in creating a screenplay. Dufresne Declaration, ¶¶ 7-9; Plaintiff Declaration, ¶ 2; Complaint, ¶ 14. A copy of the agreement appears at Doc. 9, Exhibit 1. It states that the screenplay "will require Ms. Parker's approval" and that the agreement is for a two-year basic term.

Plaintiff alleges that Dufresne infringed her copyright in the Work by publishing a substantially similar short story titled "Based on a True Story" in a paperback anthology

called "Johnny Too Bad." Plaintiff contends that Dufresne did not have her permission to use the Work to write a short story or use it in any way except to create a screenplay. Complaint, ¶ 17-19. Dufresne states in his Declaration that he did write a nine-page fictional short story "Based on a True Story" while he lived in Florida. The story is based in part on facts from the true crime story about the rape and murder of the NLU basketball player. It was published by NLU in its literary magazine in 2001 and by W. W. Norton Publishing Company as part of a 245-page anthology titled "Johnny Too Bad" in 2005. The short story is dedicated to Plaintiff. Dufresne Declaration, ¶ 16.

Dufresne also created a screenplay based on the Work. He describes the screenplay as a fictionalized version of the true story reported in Plaintiff's manuscript. The screenplay is known by the title, "To Live and to Die in Dixie." Plaintiff states that she read early drafts of the screenplay but did not approve the final version. Dufresne, on the other hand, states that Plaintiff "did review and approve the screenplay." Complaint, ¶¶ 22 and 32; Dufresne Declaration, ¶ 11.

Plaintiff also names as defendants John Philbin, John Otterbacher, and Grand Valley State University ("GVSU") who were involved in the production of a film titled "To Live and Die in Dixie," based on the screenplay written by Dufresne. Plaintiff alleges that the film is substantially similar to the Work, and the central character of the film is based on Plaintiff, who denies that she entered into any contract or license that would permit the film based on her Work. Complaint, ¶¶ 22-30.

Defendant John Philbin is an associate professor of film at GVSU, which is a state university in Michigan. He runs an annual summer film project that brings students, faculty and industry professionals together to collaborate on a movie. Philbin came to know Dufresne after Dufresne submitted a short story script that was produced in 2002. Dufresne returned in 2006 with the screenplay that he wrote for Plaintiff. GVSU approved the project and paid Dufresne $1,000, of which he paid half to Plaintiff. Dufresne and Philbin state that it was understood by all involved that GVSU would invest a great deal of money to make the filming possible, and if any money were made it would go to the university to continue support for the summer film program. Dufresne Declaration, ¶¶ 12-13; Philbin Declaration, ¶¶ 1-10, 14.

Professor Philbin and his students began to work on the film project in 2006. The 85-minute film, which cost GVSU about $140,000 to produce, was completed in 2008. The film was entirely shot in western Michigan. Plaintiff traveled to Michigan during the filming, and she had a cameo appearance as the jury foreman. Philbin Declaration, ¶¶ 14-19.

Defendant John Otterbacher was hired in 2007 as an adjunct professor at GVSU, and he served as a unit production manager/co-producer for the film. His employment at the university was concluded after the summer term of 2007. Otterbacher Declaration, ¶¶ 1-5.

Otterbacher states that Plaintiff seemed very appreciative of the fact that the university was filming the script, and she indicated that she thought the film would help her get her book published. The book was, in fact, published after filming was completed. Plaintiff

attended the premiere of the film in Michigan and was introduced as the person who had inspired the film. Plaintiff was appreciative of the attention she was given, and she was quoted in an interview as saying she was grateful to Dufresne for making the screenplay happen and to GVSU for producing the film. Otterbacher Declaration, ¶¶ 8-11; Philbin Declaration, ¶¶ 21-23.

Professor Philbin states that the film was entered in 18 film festivals around the country, for which he personally paid over $500 in entry fees. The film was played at three of the festivals, none of which was located in Louisiana. GVSU has never distributed the film. It did run for one week in each of four theaters in Michigan, with 50% of the receipts going to GVSU. The university has also given copies to interested students and donors to the university. Philbin Declaration, ¶¶ 24-25.

Plaintiff alleges that, prior to the production of the film, (unspecified) "defendants" repeatedly urged her to explain why she devoted so much of her life and finances to pursuing the case that led to the Work. Plaintiff says she reluctantly told defendants that she and family members had been sexually abused as children. Plaintiff says she disclosed this confidential information only after being assured that the defendants would not use the information in the film or otherwise publicize it. Complaint, ¶ 31. Plaintiff alleges that she viewed early drafts of the screenplay but did not approve the final version from which the film was made. ¶ 32. Plaintiff alleges that she was shocked, on viewing the film, to see that it depicted the sexual abuse in her family. Plaintiff alleges that her daughter, who

accompanied her to the premiere, learned about the abuse for the first time, exacerbating Plaintiff's anguish and humiliation. Complaint, ¶¶ 36-37.

### C. GVSU

Congress attempted by the Copyright Remedy Clarification Act to abrogate the sovereign immunity of states and state instrumentalities. The Fifth Circuit has held that the Act is unconstitutional. Chavis v. Arte Publico Press, 204 F.3d 601 (5th Cir. 2000); Rodriguez v. Texas Commission on the Arts, 199 F.3d 279 (5th Cir. 2000). GVSU represents that it is an entity of the State of Michigan and is thus entitled to immunity from Plaintiff's claims. It also offers a declaration from Thomas Butcher, its general counsel, that the university has almost no contacts with the State of Louisiana. Plaintiff's Memorandum in Opposition to the Motion to Dismiss does not contain any argument to challenge GVSU's assertions that it is entitled to dismissal based on both the Eleventh Amendment defense and lack of personal jurisdiction. Accordingly, it is recommended that all claims against GVSU be dismissed without prejudice.

### D. John Dufresne

#### 1. Additional Facts Specific to Dufresne

The record shows that Professor Dufresne taught at NLU from 1984 to 1987, but he changed his domicile to Florida, where he continues to live and work, in 1989, which was several years before the events that gave rise to this civil action. His 2000 agreement with Plaintiff was entered into in Florida when both parties were Florida residents. Dufresne later

wrote his short story, which Plaintiff alleges infringes her copyright, while he was in Florida. The story was published in Louisiana by NLU in its literary magazine. Plaintiff's complaint prays for damages for all profits gained from distributing the short story and for impoundment of all copies in the possession of any defendant. Dufresne argues that any claim based on the 2001 publication is untimely under the three-year limitations period of 17 U.S.C. § 507(b), but it would be premature to venture into the merits of any claims or defenses at this time. Only Dufresne's contacts with Louisiana are at issue on this motion.

Dufresne stated in his initial declaration that, in the last 10 years, he had been to Louisiana only sporadically. He recalled a single stop on each of three book tours held in 2001, 2006, and 2008, with the 2006 tour for the "Johnny Too Bad" anthology that contained the short story. He also recalled accompanying his wife to a conference in 2008 and, in August 2009, attending a two-day educational program in New Orleans that was directed toward professors who teach film production. The program included a panel discussion about the making of the film "To Live and Die in Dixie" for about an hour and a half, and short clips were shown to illustrate certain points.

Plaintiff responded with a supplemental declaration in which she stated that Dufresne had visited Louisiana on book tours for each of the six books he has written, with book signings held in Monroe, New Orleans, and elsewhere. Plaintiff stated that she attended the book signing in Monroe, visited with Dufresne, and discussed the progress of the screenplay. Plaintiff also stated that Dufresne appeared at Louisiana writers' workshops and conducted

readings at book and literary festivals. Between 2006 and 2008, Plaintiff stated, Dufresne engaged in frequent email communication with her about the screenplay and the making of the film. A sample of the emails is attached to Plaintiff's supplemental declaration.

Dufresne, with his memory refreshed, then filed his own supplemental declaration. He stated that he did not share Plaintiff's recollection of all of his alleged visits to Louisiana, but he did recall three visits, not mentioned in his original declaration, in the last 10 years. Those three were for two-day workshops and book festivals. Dufresne added that he also intended to limit his original declaration to his contacts with Louisiana within the last 10 years, as he did not have a reliable recollection of his visits before then.

### 2. Specific Jurisdiction is Claim-Specific

Dufresne has not, since he moved away from Louisiana about 20 years ago, maintained the kind of continuous and systematic contacts that would be necessary for a Louisiana court to exercise general jurisdiction over him for claims of any kind. With respect to specific jurisdiction, it must be kept in mind that specific personal jurisdiction is a claim-specific inquiry. Accordingly, "[a] plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274 (5th Cir. 2006).

### 3. Minimum Contacts Principles

There is a three-step analysis for specific jurisdiction: (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities

toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable. McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009).

The "minimum contacts" inquiry is fact intensive, and no one element is decisive; rather the touchstone is whether the defendant's conduct shows that it reasonably anticipates being haled into court. The defendant must not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person. McFadin, 587 F.3d at 759.

### 4. Breach of Contract

Plaintiff sets forth in her complaint facts that occurred over the course of approximately 10 years and then asserts counts such as copyright infringement and breach of contract based on assertions that the defendants' (unspecified) "actions" give rise to a violation. The court will attempt to categorize Plaintiff's claims and the facts they rely on. If Plaintiff perceives any mischaracterization in this regard, any fault is due to the lack of specificity in her complaint.

The first claim is breach of contract related to the 2000 agreement between Plaintiff and Dufresne that was entered into in Florida. Even if Dufresne had contracted with Plaintiff at a time she lived in Louisiana, that would not automatically establish sufficient minimum contacts. Burger King Corp. v. Rudzewicz, 105 S.Ct. 2174, 2185 (1985). In a contract

setting, the court must employ a "highly realistic" approach that recognizes the contract is just an intermediate step that ties up prior business negotiations and has future consequences that are the real object of the business transaction. "It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum." Id.

The two Florida residents contemplated in their contract that Plaintiff would make herself and her notes available, and Dufresne would make his best efforts to write a screenplay. If, after two years, the screenplay was not under option or otherwise under consideration for production, either party could terminate the agreement. There is nothing in the terms of the one-page contract that contemplates any future performance or other acts related to the contract occurring in Louisiana. Plaintiff later moved to Louisiana, and Dufresne had communications with her that might underlie the claim that the contract was breached when the screenplay was produced in Michigan without Plaintiff's final approval. That connection to Louisiana was not, however, purposeful availment by Dufresne of the laws and protections of Louisiana. Rather, it was simply the result of Plaintiff's unilateral, post-contract decision to move to Louisiana.

A reasonable Florida resident would not and should not anticipate being haled into a Louisiana court to defend a breach of contract claim related to a Florida contract that resulted in a movie being filmed in Michigan, merely because the other party moved to Louisiana

years after the contract was perfected and some communications were thereafter had with that other party. Accordingly, the court does not find a basis to exercise personal jurisdiction over Dufresne with respect to the breach of contract claim.

### 5. Copyright Infringement; Screenplay and Film

The same is true with respect to Plaintiff's claims that Dufresne infringed her copyright in connection with the production of the film. Dufresne wrote the screenplay in Florida, and the movie was produced in Michigan. It has been shown in Michigan and a few other places, but it has never been released in Louisiana. Short clips of the movie were shown at an educational workshop, but Plaintiff neither complains about that event in her complaint nor argues that those events fall outside the "fair use" doctrine. Dufresne did have some communication with Plaintiff, who was then in Louisiana, regarding her approval of the screenplay. That one connection to Louisiana, like merely contracting with a party who resides here, is not enough to provide minimum contacts. After a review of all of the relevant factors, the undersigned concludes that the court cannot properly exercise personal jurisdiction over Dufresne in connection with a claim that he infringed Plaintiff's copyright in connection with his writing of the screenplay and submission of it to the film's producers.

### 6. Copyright Infringement; Short Story

The record does support the exercise of specific jurisdiction over Dufresne in connection with the claim that he infringed Plaintiff's copyright when he published his short story. The story was published in a Louisiana literary magazine. Dufresne also visited

Louisiana during a book tour to promote the W. W. Norton anthology that included the story. A person should reasonably anticipate being haled into court if he publishes and promotes within a state a story that is alleged to infringe a copyright, especially if the copyright is held by a citizen of that state.

### 7. Conclusion

Plaintiff makes allegations in her complaint that the "Defendants" coaxed out of her that she and family members had been sexually abused. Plaintiff next alleges that she did not approve the final version of the screenplay and learned only on viewing the film that it depicted the sexual abuse in her family. These allegations appear to be related to the claim that Dufresne breached the contract by not having Plaintiff give final approval of the screenplay, as opposed to an effort to allege a tort claim. This is further supported by the fact that none of the six labeled "counts" set out in the complaint bears a title that indicates an effort to allege such a tort. Accordingly, the only well-pleaded claim for which the court may exercise personal jurisdiction over Dufresne is the claim that his short story violated Plaintiff's copyright. That claim should be allowed to go forward so that Dufresne may test his limitations and other defenses to the claim.

### E. John Philbin and John Otterbacher

Plaintiff's only claim against Defendants Philbin and Otterbacher are that the professors infringed her copyright through their showing of the film. Neither of those two men had any contract with Plaintiff. Philbin declares that he is originally from Illinois and

now lives in Michigan. He has visited Louisiana four times in his life. One visit was for a football game, and another was for a short vacation. The third was a brief visit to Monroe with Otterbacher in the spring of 2007. Plaintiff references this visit in her complaint when she alleges the two men visited Monroe to view various sites to shoot footage for the film. Complaint, ¶ 27. Emails attached to Plaintiff's supplemental declaration indicate that Plaintiff arranged for her guests to see area sites related to the crime and meet persons connected to the events. Philbin stated in one of his emails that Otterbacher would "probably be shooting some video for the 'making of' … ." Philbin testifies in his declaration that none of the footage recorded during the trip was used in the film. Philbin Declaration, ¶ 20. Philbin's fourth visit to Louisiana was the August 2009 educational conference in New Orleans that included a panel discussion of the making of the film, during which short clips of parts of the film were shown. ¶ 26.

Otterbacher testifies that he has visited Louisiana only two times in his life. The first was the visit to Monroe in the spring of 2007, and the second was to attend the August 2009 conference in New Orleans. Otterbacher Declaration, ¶ 13. Both Philbin and Otterbacher testify in detail about how the film was shot entirely in Michigan and where the film was presented in theaters (none of which were in Louisiana).

The attendance at the New Orleans seminar happened long after the premiere of the film in Michigan in April 2008 and the other showings that occurred soon afterward. The complaint does not assert a claim based on the airing of the clips at the New Orleans seminar.

This contact with the state by the two men is somewhat related to the claim that the men infringed a copyright when they aired the film in Michigan, but no pleaded claim arises out of the contact, and it is not so related to a claim that the non-residents should reasonably be expected to be sued in Louisiana for their actions in Michigan. The same is true with respect to the pre-premiere visit in 2007. That contact and the related emails to Plaintiff in Louisiana were more related to the events that gave rise to the copyright infringement claim but, despite that relationship, the brief visit did not itself give rise to an infringement claim or even yield material that was used in the allegedly infringing film.

A film maker may visit many states to conduct background and history investigations, but most film makers would not reasonably anticipate being sued based on the resulting film in any state with which such a visit was their only related contact. Plaintiff has not demonstrated contacts by Philbin and Otterbacher that are sufficiently related to the alleged infringement that due process would allow a Louisiana court to exercise personal jurisdiction over those non-residents. Accordingly, all claims against Otterbacher and Philbin should be dismissed without prejudice.[1]

---

[1] Given this recommendation, the court need not address whether Philbin and Otterbacher were acting in their official rather than individual capacities with respect to the alleged infringement and, if they were acting in their official capacities, whether the injunctive relief Plaintiff requests could be granted against them. See O'Connor and Peyser, Ex parte Young: A Mechanism for Enforcing Federal Intellectual Property Rights Against States, 10 Boston University J. Sci. & Tech. L. 225 (2004).

Plaintiff argues for the application of the "effects" test such as described in <u>Calder v. Jones</u>, 104 S.Ct. 1482 (1984), where it was held that California could exercise jurisdiction over two Florida journalists who wrote a libelous story that concerned the California activities of a California entertainer, was based on California sources, and the brunt of the harm, in terms of the plaintiff's emotional distress and the injury to her professional reputation, was suffered in California. The state of California was "the focal point both of the story and of the harm suffered," so jurisdiction over the Florida journalists was "therefore proper in California based on the 'effects' of their Florida conduct in California." <u>Calder</u>, 104 S.Ct. at 1486-87.

The Fifth Circuit has explained that the effects rule is not limited to libel claims, though the distant effects of libel claims are perhaps more pronounced than those of other intentional torts. Also, the key to <u>Calder</u> is that the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the state. Whether the effects of the intentional tort, alone or in combination with other contacts, are sufficient to support personal jurisdiction will turn upon the particular facts of each case. <u>Allred v. Moore & Peterson</u>, 117 F.3d 278, 286-87 (5th Cir. 1997).

Some district courts construe copyright infringement claims as intentional torts to invoke the effects test and promote the exercise of jurisdiction over a defendant who is seen as aiming his allegedly tortious conduct at the forum state. See <u>Illustro Systems Intern. LLC v. International Business Machines</u>, 2007 WL 1321825 (M.D. Tex. 2007) (collecting cases

on the issue). A treatise on copyright has observed that the libel at issue in Calder was an intentional tort, but copyright is a strict liability tort that does not require intent as an element of the prima facie case. The author found it "deeply distressing to see courts flagrantly disregarding copyright's long-standing nature in order to manipulate their own exercise of jurisdiction" under long arm statutes. 5 Patry on Copyright § 17:167. "Thus, analogies to Calder and intentional torts are inappropriate." Id.

There may be copyright cases where the nature of the conduct alleged or described in the supporting documents suggests an intentional act directed at causing harmful effects in the forum state, but not every copyright case will include such facts. The documents presented by both Plaintiff and the defendants in this case suggest that Plaintiff was aware of the film project, spoke with Philbin and Otterbacher often, attended the premiere and praised the film, and only later accused the two men of copyright infringement. Perhaps Plaintiff has a case for infringement, but the facts presented to this point do not suggest intentional acts by Philbin and Otterbacher that they intended to cause harmful effects in Louisiana. Thus, the effects test is of little or no applicability in this case, and it does not change the recommended result.

**Venue**

Defendants next argue that venue is improper. Copyright actions may be instituted in the district court in a district "in which the defendant or his agent resides or may be found." 17 U.S.C. § 1400(a). A defendant "may be found" in any district in which he is

amenable to personal jurisdiction, so venue and jurisdiction are co-extensive in copyright cases. <u>Dudnikov v. Chalk & Vermilion Fine Arts, Inc.</u>, 514 F.3d 1063 n.2 (10th Cir. 2008); <u>Palmer v. Braun</u>, 376 F.3d 1254, 1259 (11th Cir. 2004); and <u>TracFone Wireless, Inc. v. Carson</u>, 2008 WL 4107584, *8 (M.D. Tex. 2008). It was recommended that the court exercise jurisdiction over Dufresne with regard to the claim that his short story infringed copyright law, so venue for that claim is also proper.

Accordingly,

**IT IS RECOMMENDED** that the **Motion to Dismiss (Doc. 9)** be **granted in part** and **denied in part** as follows:

(A) All claims against Grand Valley State University, John Harper Philbin, and John Otterbacher should be **dismissed without prejudice**; and

(B) All claims against John Dufresne, except the copyright infringement claim related to his short story, should be **dismissed without prejudice**.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 18th day of May, 2010.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE